UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**JAMES PAULI**, on behalf of himself and all others similarly situated,

        **Plaintiff,**

 vs.              5:22-CV-00279
                  (MAD/ML)
**OLLIE'S BARGAIN OUTLET INC.,**

        **Defendant.**
_____

**APPEARANCES:**         **OF COUNSEL:**

**GATTUSO & CIOTOLI, PLLC**    **FRANK S. GATTUSO, ESQ.**
The White House
7030 East Genesee Street
Fayetteville, New York 13066
Attorneys for Plaintiffs

**VIRGINIA & AMBINDER, LLP**   **JAMES E. MURPHY, ESQ.**
40 Broad Street, 7th Floor      **MICHELE A. MORENO, ESQ.**
New York, New York 10004     **LADONNA LUSHER ESQ.**
Attorneys for Plaintiffs

**FISHER & PHILLIPS, LLP**     **HEATHER Z. STEELE ESQ.**
Two Logan Square, 12th Floor    **KATHLEEN MCLEOD CAMINITI, ESQ.**
100 N. 18th Street
Philadelphia, Pennsylvania 19103
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    On March 22, 2022, Plaintiff James Pauli ("Plaintiff") filed this putative collective and class action against Defendant Ollie's Bargain Outlet, Inc., ("Defendant" or "Ollie's") alleging violations of the Federal Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). *See* Dkt. No. 1. Currently pending before the Court is Plaintiff's motion for

conditional certification pursuant to 29 U.S.C. § 216(b).[1]  *See* Dkt. No. 44.  Additionally, Defendant has moved pursuant to Fed. R. Civ. P. 12(f) to strike portions of Plaintiff's reply submissions.  *See* Dkt. No. 57.  For the reasons and authorities set forth below, both motions are denied.

## II. BACKGROUND

Defendant is a Pennsylvania-based corporation that has operated since 1982 and is described as "one of America's largest retailers of closeout merchandise and excess inventory[.]" Dkt. No. 1 at ¶ 11.  Defendant operates over four hundred stores in twenty-nine states, with approximately twenty-eight locations in New York.  *See id.*  Defendant is a described as "a discount retail store chain" that "focuses on closeouts, overstocks, package changes, manufacturer refurbished goods, and irregulars."  *Id.* at ¶ 19.  Defendant markets itself under the slogan "Good Stuff Cheap."  *Id.* at ¶ 11.

Plaintiff is a New York resident who has worked at an Ollie's store in Cicero, New York since August 2013.[2]  *See* Dkt. No. 1 at ¶ 8.  Since November 2013, Plaintiff's position title has been "Co-Team Leader" or "CTL."  *Id.* at ¶ 21.  Co-Team Leaders spend "over 90% of their time on tasks such as unloading supply trucks, unboxing products (hundreds per day sometimes), stocking shelves, operating cash registers, cleaning the store . . . , setting up product displays . . . , shoveling and salting snow and ice, and helping customers."  *Id.* at ¶ 28.  Plaintiff typically works more than ten hours per day, or fifty-to-sixty hours per week.  *See id.* at ¶ 22.  Plaintiff receives a "flat salary of approximately $940 per week, regardless of how many hours he works."  *Id.* at ¶

---

[1] Plaintiff has not sought certification or class recognition relative to the NYLL claims.

[2] A few times a year, Plaintiff also worked at Defendant's stores in Dewitt and New Hartford, New York "when they needed extra help."  Dkt. No. 44-5 at ¶ 4.

25.

According to the complaint, "[i]n practice, the job duties of Co-Team Leaders are indistinguishable from the Customer Service Associates, Sales Associates, Sale Supervisor, Freight Flow Supervisor and Assistant Team Leader positions for 95% of the workday." Dkt. No. 1 at ¶ 20. However, those positions are "classified as non-exempt and paid overtime compensation" whereas Co-Team Leaders are "misclassified as exempt and not paid overtime." *Id.* at ¶ 20. Plaintiff and the other employees are also "expected to assist with cleaning the stores from approximately 5:00 p.m. to closing at 9:00 p.m., and then for an additional hour after the store closes until 10:00 p.m., except for Sundays when its approximately 4:00 p.m. to closing at 7:00 p.m., and then for an additional half-hour after closing." *Id.* at ¶ 15.

Plaintiff and the other employees are "regularly in contact" with Defendant's corporate headquarters and upper level managers. Dkt. No. 44-5 at ¶ 18. The upper-level District and Regional Managers oversee the stores. *See id.* For instance, the "District Manager would typically come into the store once a week to do store walk-throughs and write down what needed to be done." *Id.* at ¶ 17. Every day, Plaintiff and the other employees "would receive email correspondence instructing [them] on what needed to be done in the stores." *Id.* at ¶ 18. They also "had an electronic list of duties that [they] had to perform, including cleaning the bathrooms." *Id.*

Plaintiff describes the proposed collective as:

> All current and former Co-Team Leaders who have worked for Defendant from March 22, 2019 through the date of trial[], and elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b) ("Nationwide Collective Class").

Dkt. No. 1 at ¶ 33.

(Proposed) Opt-In Plaintiff Bob Swain

3

Bob Swain worked for Defendant in New Hartford, New York from around November 2014 to sometime in 2019, when he transferred to a location in Dewitt, New York. *See* Dkt. No. 44-6 at ¶ 2. Mr. Swain worked as a Co-Team Leader. *See id.* at ¶ 3. Mr. Swain "typically worked five days per week," but often six or seven days per week at various times. *See id.* at ¶ 4. Despite working as many as fifty-to-seventy hours each week, Mr. Swain's paystubs reflected forty hours per week. *See id.* at ¶ 5. Mr. Swain received "a flat salary of approximately $884.00 per week[.]" *Id.* at ¶ 7. Mr. Swain did not receive any overtime compensation when working over forty hours in a given week. *See id.* at ¶ 8.

According to Mr. Swain, he spent over eighty percent of his time working "on tasks identical to those of hourly employees[.]"[3] Dkt. No. 44-6 at ¶ 12. Mr. Swain performed these same duties at both the New Hartford and Dewitt locations. *See id.* at ¶ 15. At the time of his hiring, Mr. Swain "was told in training that at least eight hours of [his] 10-hour shifts would be spent on the floor performing physical work[.]" *Id.* at ¶ 16.

Defendant's retail locations are "controlled by Ollie's corporate headquarters, as well as by upper-level District and Regional Managers that oversaw the stores." Dkt. No. 44-6 at ¶ 17. The District Manager would "come into the store a few times per month do [sic] walk-throughs and write down what needed to be done." *Id.* The District Manager also controlled "scheduling and had to approve any modifications." *Id.* If an employee requested a pay raise, "only the District Manager could approve that, with the additional approval of the Regional Manager." *Id.* Furthermore, each day Mr. Swain and the other employees "would receive email correspondence instructing [them] on what needed to be done in the stores." *Id.* at ¶ 18. Mr. Swain and the other

---

[3] The tasks included: "working the cash register, unloading trucks, stocking shelves, retrieving carts from the parking lot, cleaning (including bathrooms, floors, windows, sidewalks, etc.), and shoveling and salting snow and ice." Dkt. No. 44-6 at ¶ 12.

employees "also had an electronic list of duties that [they] had to perform, including cleaning the bathrooms, scrubbing the floors, and all other cleaning work that needed to be done." *Id.* Moreover, "merchandising decisions regarding the layout of the store were made at the corporate level at headquarters." *Id.*

(Proposed) Opt-In Plaintiff Judy Cacciola

Judy Cacciola worked for Defendant in Media, Pennsylvania from approximately October 2021 to November 3, 2022. Dkt. No. 44-7 at ¶ 2. From the outset of her employment until around February 2022, Ms. Cacciola worked as a Co-Team Leader. *See id.* at ¶ 3. Ms. Cacciola typically worked five days a week from about 12:00 p.m. to 10:00 p.m. for a total of fifty weekly hours. *See id.* at ¶ 4. Often she would stay later than 10:00 p.m., thus working even more than fifty hours each week. *See id.* In December, she worked even more hours as she was required to work six days a week. *See id.* Ms. Cacciola received "a flat salary of approximately $55,000.00 per year" and did not receive overtime compensation when she worked over forty hours in a week. *See id.* at ¶¶ 7-8.

According to Ms. Cacciola, while working as a Co-Team Leader, she "spent over 90% of [her] time on tasks that are identical to that of hourly employees[.]"[4] Dkt. No. 44-7 at ¶ 12. Such hourly employees included "customer service associates, sales associates, sale supervisors, fright [sic] flow supervisors, and assistant team leader positions." *Id.* at ¶ 11. At the time of her hiring,

---

[4] These duties included: unloading supply trucks, unboxing products, stocking shelves, operating cash registers, wiping down cash registers, refilling the plastic bag carousel at checkout, restocking toilet paper in the bathrooms and straightening up the bathroom, cleaning the floors and customer spills, cleaning the back room, wiping down tables in the break room, cleaning up coffee cups and masks left behind by customers, putting back carts full of misplaced items, cleaning products in the back room that had black soot on them and needed to be wiped down, folding towels, brining in shopping carts from the parking lot, taking out the trash, and arranging shelves. Dkt. No. 44-7 at ¶ 12.

"it was never even discussed with [Ms. Cacciola] that as a Co-Team Leader [she] would be expected to perform any managerial duties such as hiring, firing, or scheduling." *Id.* at ¶ 16. Instead, Defendant's "retail locations were controlled by Ollie's corporate headquarters, as well as by upper-level District and Regional Manager that oversaw the stores." *Id.* at ¶ 17.  For instance, the District Manager would often come to the store to do "walk-throughs." *Id.*  Moreover, every day Ms. Cacciola and the other employees would receive "task check lists and electronic notes from corporate or the upper-level managers about what needed to be done in the stores." *Id.* at ¶ 18.

   Discovery Materials from *Kane v. Ollies's Bargain Outlet, Inc.*

  Plaintiff has submitted sworn declarations and deposition testimony from six individuals associated with a similar—albeit unsuccessful—FLSA collective certification request involving Defendant in the United States District Court for the Middle District of Pennsylvania.  *See* Dkt. Nos. 44-9, 44-10, 44-11, 44-12, 44-13, and 44-12; *see also Kane, et al. v. Ollie's Bargain Outlet, Inc.*, No. 18-CV-02261 (JPW), 2020 WL 6889195 (Nov. 24, 2020, M.D. Pa.).  The declarations are submitted from former Co-Team Leaders who worked at Defendant's stores in North Carolina, Virginia, and Pennsylvania, at various periods of time ranging from 2015 to 2018.  *See* Dkt. Nos. 44-9, 44-10, 44-11, and 44-12.  In general, each former Co-Team Leader contended that they were deemed to be non-exempt employees, even though their duties were largely indistinguishable from Defendant's hourly employees. *See id.*   Likewise, the deposition excerpts provided indicate that at least two former Co-Team Leaders who worked at Defendant's stores in North Carolina, Pennsylvania, and New Jersey *circa* 2016 had similar contentions.  *See* Dkt. Nos. 44-13, 44-14, and 44-15.

   Defendant's Handbook, Policies, and Job Postings

6

According to Plaintiff, "Ollie's maintains a single 'Associate Handbook,' as well as other policies and procedures, which are generated by its corporate headquarters, and apply to CTLs in all stores nationwide." Dkt. No. 44-24 at 15-16; *see also* Dkt. No. 44-17. The Associate Handbook purportedly "sets forth guidelines for 'basic work rules,' 'job responsibilities,' 'overtime,' 'pay rates, raises & promotions,' 'performance evaluation,' 'personal appearance,' 'timekeeping procedures,' and 'work schedule,' among others." Dkt. No. 44-24 at 16. Aside from the Handbook, Defendant also maintains corporate policies setting forth standards for timely product deliveries and processing, physical store layouts, store maintenance, and product recovery. *See* Dkt. No. 44-18; Dkt. No. 44-19; Dkt. No. 44-20.

Plaintiff has also produced approximately forty CTL job postings from Defendant's stores in nineteen different states that were posted on or around November 15, 2022. *See* Dkt. No. 44-8. In general, the postings state that the CTL "is required to provide leadership for the successful operation of the entire sales floor and receiving area[.]" *Id.* Under the "primary" duties description, the postings state: "Assist the Store Team Leader with managing payroll budgets, expenses, store banking, shrink reduction, and the timely completion of related reports to ensure financial and operational goals are met." *Id.* The postings also reference duties and/or expectations toward "providing exceptional Associate and Customer service experiences"; "[e]nsur[ing] that store standards, seasonal transition planning, inventory processes, and company programs meet all operational expectations"; "[d]evelop[ing] and execut[ing] talent planning"; "[e]nsur[ing] proper scheduling and staffing for the business needs that are met"; and "[p]erfom[ing] all functions to open and close the store when needed and any additional responsibilities and/or duties as assigned." *Id.*

### III. DISCUSSION

A.     **FLSA Collective Certification**

The FLSA requires employers to pay certain non-exempt employees a premium hourly wage for all hours worked in excess of forty hours per week. *See generally* 29 U.S.C. §§ 201, *et. seq*. To enforce such requirements, the FLSA allows for collective litigation, similar to Federal Rule of Civil Procedure 23, "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). "The unique FLSA collective differs from a Rule 23 class because plaintiffs become members of the collective only after they affirmatively consent to join it." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016). As such, "a conditionally certified FLSA collective does not acquire an independent legal status." *Id.*

The Second Circuit has endorsed a two-step process to certify an opt-in FLSA collective. *See Myers v. Hertz Corp.*, 625 F.3d 537, 554-55 (2d Cir. 2010). The first stage requires the court to make an initial determination whether to send notice to "potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.* at 555 (collecting cases). The second stage occurs after notice has been sent out to the proposed collective members and often when at least some discovery has taken place. *See Iglesias-Mendoz v. La Belle Farm, Inc.*, 239 F.R.D. 363, 367 (S.D.N.Y. 2007). At that point, upon a proper application, the court considers any challenges to the prospective members that have opted-in. *See id.*

Unlike Rule 23 certification, "no showing of numerosity, typicality, commonality and representativeness need be made." *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005). Rather, the plaintiffs can satisfy the initial burden with a "'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or

plan that violated the law.'" *Id.* (quoting *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)). The plaintiffs may rely on their own pleadings, affidavits, declarations, or the affidavits and declarations of other potential class members. *See Iglesias-Mendoz*, 239 F.R.D. at 368; *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 91, 96 (S.D.N.Y. 2003) (citation omitted). Furthermore, "courts regularly rely on . . . hearsay statements in determining the propriety of sending notice" in FLSA conditional certification cases. *Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 563 (S.D.N.Y. 2012).

The Second Circuit has repeatedly emphasized that the "'modest factual showing' cannot be satisfied simply by 'unsupported assertions,' . . . but should remain a low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Myers*, 624 F.3d at 555 (emphasis in original) (citations omitted). Furthermore, "[a]s numerous courts in this Circuit have held, 'the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for §216(b) purposes.'" *Jenkins*, 853 F. Supp. 2d at 323 (collecting cases). Ultimately, "[w]hile the burden of proof at the conditional certification stage is modest, 'it is not non-existent.'" *Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317, 322 (E.D.N.Y. 2012) (citation omitted).

Plaintiff asserts that FLSA certification "is proper because Plaintiffs were all similarly situated and subject to Defendant's allegedly unlawful compensation scheme." Dkt. No. 44-24 at 19. Aside from the pleadings, Plaintiff adduces declarations from himself "and two putative collective members, sworn testimony from six former CTLs, Defendant's employee handbook[,] and other nationwide policies and procedures," including "job posting across multiple facilities in

multiple states." *Id.* at 23-24 (citations omitted).  Plaintiff asserts that "[r]egardless of geographic location, all CTLs share substantial similarities in their job duties and responsibilities, and all CTLS were unvaryingly classified as exempt from the FLSA[.]" *Id.* at 9.  In support, Plaintiff asserts that "Ollie's maintains a single 'Associate Handbook,' as well as other policies and procedures, which are generated by its corporate headquarters, and apply to CTLs in all stores nationwide."  *Id.* at 15-16.  Plaintiff states that the Associate Handbook "sets forth guidelines for 'basic work rules,' 'job responsibilities,' 'overtime,' 'pay rates, raises & promotions,' 'performance evaluation,' 'personal appearance,' 'timekeeping procedures,' and 'work schedule,' among others." *Id.* at 16.

In response, and as an general matter, Defendant asserts that "Plaintiff's submission of some cherry-picked materials from *Kane*, opens the door to the admission of all the materials from *Kane* necessary to put Plaintiff's submissions in context[.]"  Dkt. No. 53 at 23.  Defendant asserts that "the *Kane* court denied conditional certification under the same 'modest factual showing' standard applied in the Second Circuit."  *Id.* at 24 (quoting *Kane*, 2020 WL 6889195, at *5).  Defendant contends that "by riding piggyback on the discovery in *Kane*, Plaintiff has in effect engaged in discovery" and that "[t]he 'modest-plus' standard of review consequently applies to Plaintiff's motion, under which the court considers not just the movant's submissions, but also 'the defendant's opposing materials.'"  *Id.* (citations omitted).

Furthermore, Defendant asserts that, similar to the certification denial in *Kane*, the "'vast array' of differences between the job duties and responsibilities of Plaintiff and other CTLs precludes conditional certification."  Dkt. No. 53 at 25.  Defendant claims that Plaintiff has failed to show an FLSA violation as applied to his own circumstances, and thus cannot be similarly situated to any proposed plaintiffs.  *See id.* at 25-26.  Specifically, Defendant asserts that

"Plaintiff's three declarants (including himself) allege they spend 80% to 90% of their time on what they deem nonexempt duties[,]" which "is simply irrelevant." *Id.* at 26.  Defendant contends that "managers do not lose their exempt status because they engage in significant non-exempt activities." *Id.* at 27 (collecting cases).  Defendant asserts that "[t]he only other evidence Plaintiff offers is several alleged across-the-board Ollie's policies, all of which are perfectly legal and consequently cannot support Plaintiff's motion." *Id.* at 26.  Defendant states that "[t]he law is well-settled that the mere existence of a common job description, common training, and common lawful policies cannot justify conditional certification." *Id.* at 29 (citations omitted).

      Herein, the Court finds that Plaintiff has failed to meet the modest burden necessary for conditional FLSA certification.  The first problem with Plaintiff's proposed collective is the limited quantity of proposed opt-in plaintiffs in light of a request that spans "nationwide" in twenty-eight states.  *See Jibowu v. Target Corporation*, 492 F. Supp. 3d 87, 124 (E.D.N.Y. 2020) (stating that "[c]ourts in this Circuit have generally denied certification of *de facto* unlawful policies in only some of a defendant employer's many locations") (collecting cases).  Plaintiff has produced statements from only two proposed opt-in plaintiffs (aside from himself), including one former employee that Plaintiff knew personally and often worked with at the same New York-based location.  *See* Dkt. No. 44-6; Dkt. No. 44-7.  The Court has closely reviewed the submissions from Ms. Cacciola, and the sworn statements and testimony from the proposed opt-in plaintiffs in *Kane*—all of whom worked at Defendant's stores in out-of-state locations years before this action commenced.  *See* Dkt. No. 44-7; Dkt. No. 44-9; Dkt. No. 44-10; Dkt. No. 44-11; Dkt. No. 44-12; Dkt. No. 44-13; Dkt. No. 44-14.  But the Court is simply not persuaded that this evidence reflects a modest "similarly situated" showing necessary to warrant a sweeping

nationwide FLSA collective.[5]  *See Jibowu*, 492 F. Supp. 3d at 124 (denying FLSA certification and noting, in relevant part, that "[w]hile relying on Defendant's lawful ETL policies as demonstrating the uniformity of its practices across the country, Plaintiffs have submitted only eight sworn statements in approximately six states as to Defendant's purportedly unlawful unofficial policy") (footnote omitted).

Moreover, the Court has closely reviewed Defendant's Associate Handbook, corporate policies, and job postings, which Plaintiff relies heavily upon in support.  *See* Dkt. No. 44-8; 44-17; Dkt. No. 44-18; Dkt. No. 44-19; Dkt. No. 44-20.  As to the job postings, the Court finds that there is nothing on their face suggesting that CTLs are improperly classified as exempt on a *nationwide* scale.  *See* Dkt. No. 44-8; *see also Brown v. Barnes and Noble, Inc.*, 252 F. Supp. 3d 255, 263 (S.D.N.Y. 2017) (finding that "[u]se of a common job description does not mean that conditional certification is *per se* warranted in every case") (collecting cases).  In fact, Plaintiff and the proposed opt-in plaintiffs seemingly do not dispute that they are in fact performing the tasks described therein; rather, their contention is that the vast majority of their time was spent performing what could be described as the non-exempt portions of the duties.  *See Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 800-01 (S.D.N.Y. 2012) (stating that "pointing to a common policy at Marshalls regarding the job duties of ASMs provides no proof that other ASMs are performing non-exempt duties, particularly given that all policies and writings from Marshalls dictate just the opposite"), *adopted*, No. 09-CV-9575 (LAP), 2012 WL 2588771 (S.D.N.Y. July 2,

---

[5] It is also notable that Plaintiff, Mr. Swain, and Ms. Cacciola all report that their respective stores were overseen by "District" and "Regional" managers, which further weighs against a nationwide collective.  Dkt. No. 44-5 at ¶¶ 17-19; Dkt. No. 44-6 at ¶¶ 16-18; Dkt. No. 44-7 at ¶¶ 16-18; *see also Jibowu,* 492 F. Supp. 3d at 125 (noting that "[a]dditionally, Defendant attributes Plaintiffs' performance of primarily nonexempt work to Plaintiffs' 'personal decisions or alleged practices of *local* management teams, explanations that cannot possibly be representative of thousands of other ETLs") (citations omitted).

2012).

Defendant's corporate policies and Associate Handbook are not evidence demonstrating that other CTL's are improperly classified as exempt at Defendant's four hundred stores in twenty-eight states. As to the policies, and as Plaintiff seems to acknowledge, these materials only show that Defendant maintains guidelines setting forth common operational standards throughout its stores. The Court has reviewed what appears to be relevant portions pertaining to "Overtime" and "Pay Rates, Raises & Promotions." Dkt. No. 44-17 at 9. But these provisions make no reference to CTLs, or any other specific job title. *See generally id.* As far as the Court can discern, the Associate Handbook merely reiterates that Defendant is obligated to "only pay overtime to non-exempt associates" for "[a]ll hours worked in excess of forty (40) hours per week[.]" *Id.* at 9. On the whole, Plaintiff has failed to demonstrate evidence warranting a nationwide collective.

As such, Plaintiff's request for FLSA collective certification must be denied.

**B.   Defendant's Motion to Strike**

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). Generally, motions to strike are disfavored and are not warranted "unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010) (collecting cases).

Defendant seeks to strike "Paragraphs 7 through 12 and 14 of Judy Cacciola's Reply Declaration [Dkt. No. 55-4] and the references and citations to the Reply Declaration within Plaintiffs' Reply Memorandum of Law [Dkt. No. 55-4] . . . ." Dkt. No. 57-1 at 4. Defendant asserts that the documents contain allegations that "are false, scandalous, and highly prejudicial to

13

Ollie's."  *Id.*  Defendant contends that the Cacciola Reply Declaration constitutes a "direct and personal" attack on counsel by suggesting that defense counsel "engaged in 'coercive,' 'duplicitous,' and 'misleading' tactics, and deliberately failed to inform interviewees of their rights."  *Id.* at 12-13.

In opposition, Plaintiff asserts that Rule 12(f) "applies exclusively to pleadings and is not applicable to the Cacciola Reply Declaration or the arguments made by Plaintiff."  Dkt. No. 64 at 11.  Plaintiff asserts that the request "improperly ask[s] this Court to resolve a factual dispute and make a credibility determination."  *Id.* at 13.  In any event, Plaintiff argues that Defendant has failed to demonstrate "any redundant, immaterial, impertinent, or scandalous matter."  *Id.* at 16.  Plaintiff asserts that "[t]he Cacciola Reply Declaration was filed in direct response to Defendant's Opposition to Plaintiffs' Motion for Conditional Certification in which Defendant submitted 160 unilaterally procured declarations from current employees and inaccurately contended . . . that Ms. Cacciola had submitted a declaration in support of Plaintiffs' motion 'as an act of revenge[.]'"  *Id.* at 17.

In this case, the Court will deny Defendant's motion to strike because it would require making a credibility determination to resolve a factual dispute.  Even if the Court were to make a finding favorable to Defendant, "[t]he mere fact that testimony is inconsistent is insufficient to justify striking an entire document."  *Trinidada v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 553 (S.D.N.Y. 2013).  Notwithstanding, there is nothing inherently scandalous about Ms. Cacciola's Reply Declaration.  In opposition to Plaintiff's motion seeking conditional certification, Defendant accused Ms. Cacciola of, *inter alia*, acting out of "revenge," which, in the Court's view, opened the door for an opportunity to explain her motivations.  Dkt. No. 53 at 16.  By all indications, and without making any finding as to the merits of this particular issue, Ms.

Cacciola's Reply Declaration appears to be an appropriate submission when viewed in the context of Defendant's opposition. No further discussion is necessary on this point.

Accordingly, Defendant's Rule 12(f) motion to strike (Dkt. No. 57) must be denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion (Dkt. No. 44) seeking conditional FLSA collective certification is **DENIED**; and the Court further

**ORDERS** that Defendant's motion (Dkt. No. 57) to strike portions of Plaintiff's reply submissions (Dkt. No. 55) is **DENIED**; and the Court further

**ORDERS** that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 15, 2023
       Albany, New York

Mae A. D'Agostino
U.S. District Judge